UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **United States of America,** | |
| Plaintiff, | |
| v. | **No. 19 CR 850** |
| **Sheldon Morales**, | Judge Mary M. Rowland |
| Defendant. | |

**Defense Sentencing Memorandum**

Defendant Sheldon Morales, through undersigned counsel, respectfully submits this sentencing memorandum. The defense recommends that the Court impose the mandatory minimum sentence of 180 months. Mr. Morales also requests a recommendation to RDAP.

**1. Defense objection to the PSR**

The defense objects to the two-level enhancement for alleged threats of violence in Probation's guidelines calculation in the PSR. This enhancement is based on a speculative interpretation of phone calls with no evidence that any act of violence occurred. At most, these calls demonstrate that Mr. Morales was angry after a robbery at his home—an entirely normal reaction under the circumstances. Mr. Morales cooperated with Bartlett Police during the investigation. Although he vented his frustrations and suspicions on the phone to his brother and his friends, he never made any efforts to communicate threats to the people he believed robbed his house. He also never took any action to retaliate against the people he believed robbed his house. In fact, Mr. Morales' last conviction for a crime of violence was nearly twenty years ago, a 2007 misdemeanor battery, where he pushed and

grabbed the arm of an officer who was trying to arrest his brother, Aaron. When viewed in this context, these statements are insufficient to add a two-level enhancement for threats of violence.

Based on this objection, the defense calculates Mr. Morales' advisory sentencing guideline range as 235—293 months, based on a final offense level of 34 and criminal history category V.

**2. Mr. Morales' criminal history is overstated**

Though Mr. Morales receives ten criminal history points and is in criminal history category V, his criminal history is worth discussing because it can still be considered under section 3553(a). *See generally United States v. Mansfield,* 21 F.4th 946, 955–58 (7th Cir. 2021) (discussing in detail when and how a sentencing court may consider arrests that did not lead to a conviction). The Probation Office makes much of the length of Mr. Morales' criminal history in its recommendation. However, the Court cannot overlook the fact that Mr. Morales is African American, which bears a direct relationship to his criminal history score. In November 2017, the U.S. Sentencing Commission published Demographic Differences in Sentencing: An Update to the 2012 Booker Report, which found that black male offenders continue to receive sentences that are approximately 20% higher than similarly situated white male offenders, after controlling for a wide variety of other

sentencing and demographic factors. The key findings note that this trend remains unchanged in recent years.[1] *See* Figure 1 (on next page).



**Key Findings**

Consistent with its previous reports, the Commission found that sentence length continues to be associated with some demographic factors. In particular, after controlling for a wide variety of sentencing factors, the Commission found:

- **Black male offenders continued to receive longer sentences than similarly situated White male offenders.** Black male offenders received sentences on average 19.1 percent longer than similarly situated White male offenders during the Post-Report period (fiscal years 2012-2016), as they had for the prior four periods studied. The differences in sentence length remained relatively unchanged compared to the Post-*Gall* period.

- **Non-government sponsored departures and variances appear to contribute significantly to the difference in sentence length between Black male and White male offenders.** Black male offenders were 21.2 percent less likely than White male offenders to receive a non-government sponsored downward departure or variance during the Post-Report period. Furthermore, when Black male offenders did receive a non-government sponsored departure or variance, they received sentences 16.8 percent longer than White male offenders who received a non-government sponsored departure or variance. In contrast, there was a 7.9 percent difference in sentence length between Black male and White male offenders who received sentences within the applicable sentencing guidelines range, and there was no statistically significant difference in sentence length between Black male and White male offenders who received a substantial assistance departure.

*Figure 1*

While the guidelines are intended to function in a race-neutral, objective manner, structural disparities nonetheless creep in through the criminal history score. For example, for the three years ending in 2018, ABC News found that Black people are five to 10 times more likely to be arrested than White people, according to data reported to the FBI from police departments nationwide. *ABC News analysis of police arrests nationwide reveals stark racial disparity* (June 11, 2020).

The increased rate of arrests can artificially inflate the criminal-history score of Black defendants, nullifying the objectivity of the guidelines' criminal-history

---

[1] U.S. Sentencing Comm'n, Demographic Differences in Sentencing: An Update to the 2012 Booker Report (2017).

score. In short, over-policing of Black communities and higher arrest rates of Black people, particularly Black men, leads to a situation where Black defendants will consistently have higher criminal history scores and thus consistently higher guidelines than White defendants charged with the same offense.

Additionally, often overlooked in consideration of criminal histories are two important and intertwined factors: the "adultification" of Black children and the over-policing of Black communities, which have been shown to lead to high levels of Black teens with multiple arrests for petty offenses, such as trespassing, gambling, loitering, and low-level marijuana, or drug possession prior to reaching adulthood.

Michelle Alexander examined mass incarceration and structural racial disparities in *The New Jim Crow: Mass Incarceration in the Age of Colorblindness*, which focused on the "war on drugs":

> Vast numbers of people are swept into the criminal justice system by the police, who conduct drug operations in <u>primarily</u> poor communities of color. They are rewarded in cash—through drug forfeiture laws and federal grant programs—for rounding up as many people as possible, and they operate unconstrained by constitutional rules of procedure that were once considered inviolate. Police can stop, interrogate, and search anyone they choose for drug investigations, provided they get "consent." Because there is no meaningful check on the exercise of police discretion, racial biases are granted free reign. In fact, police are allowed to rely on race as a factor in selecting whom to stop and search (even though people of color are no more likely to be guilty of drug crimes than whites)—effectively guaranteeing that those who are swept into the system are primarily black and brown."

*Id.* at 185. Alexander paints an all-too-familiar picture of the Chicago area of Mr. Morales' youth. Black communities remain inundated with a disproportionate number of police officers fighting the "war on drugs," using the "broken windows" theory of policing. Small issues, like gambling or trespassing, have been increasingly treated as problems that can only be dealt with in court, triggering a

cycle of arrests and the creation of a lengthy criminal history for behavior that is not particularly serious, especially in teens.

Mr. Morales' early history fits this pattern. The PSR notes that Mr. Morales' first arrest was at 12 when he was not even a teenager. PSR ¶ 110. Many of his arrests over the ensuing years that did not lead to convictions include arrests on minor charges such as criminal damage to property (PSR ¶¶ 111, 115), criminal trespass to vehicles or possession of a stolen motor vehicle (PSR ¶¶ 113, 114, 125), possession of cannabis or other controlled substances (PSR ¶ 120, 154, 155), obstructing the sidewalk (PSR ¶ 136), obstructing police (PSR ¶ 149), and the largest category, driving-related offenses such as driving without a license, driving with a suspended license, or driving without insurance (PSR ¶¶ 118, 126, 129, 130, 131, 132, 133, 134, 135, 138, 139, 140, 141, 146, 150, 151, 156, 157, 158, 159, 163, 165, 168, 169, 170, 171).

There is no dispute that Mr. Morales was arrested many times throughout his life, but the majority of his cases were dismissed, or he was found not guilty. Even more, the majority of Mr. Morales' prior convictions are for minor offenses, such as driving on a suspended license or without a driver's license (PSR ¶¶ 47, 48, 49, 53, 54, 55, 56, 64, 68, 69, 70, 72, 73, 75, 76, 82, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 96), trespassing (PSR ¶ 44), unlawful assembly (PSR ¶ 52), criminal damage to property (PSR ¶¶ 66, 77) possession of cannabis (PSR ¶¶ 58, 71), and possession of alcohol on public property (PSR ¶¶ 62, 74). The point is that Mr. Morales was drawn into the criminal-processing system at an early age and frequently returned due to arrests on minor matters. He never escaped.

Probation also notes that Mr. Morales was alleged to have been a member of the Gangster Disciples, based on law enforcement reports. The Chicago Police Department's gang database has been repeatedly shown to be inaccurate and

DEFENSE SENTENCING MEMORANDUM

unreliable. *See, e.g.,* Heather Cherone, *More Than 3 Years After Watchdog Warned Chicago Police Gang Databases Were 'Deeply Flawed,' New System Poised to Launch Despite Objections,* WTTW (Nov. 25, 2022). The Chicago Inspector General's 2019 audit of the database found that "the records were riddled with errors, ripe for abuse and disproportionately targeted Black and Latino Chicagoans." *Id.*; *see also* Matt Masterson, *Gang Database 'Strains Police-Community Relations' City Watchdog Says,* WTTW (Apr. 11, 2019). It is likely that the Evanston Police Department's records are similarly flawed, and the allegations of Mr. Morales' gang ties should be viewed with caution.

This approach is an unsurprising result of the structural factors discussed above that lead to defendants from disadvantaged and minority backgrounds receiving higher sentences than similarly situated defendants. The Court should therefore consider Mr. Morales' history of arrests and probation's unsupported statements regarding a history of violence with caution because it is not necessarily an accurate proxy for his actual criminal history. *See* USSG § 4A1.3(a)(3) ("PROHIBITION.—A prior arrest record itself shall not be considered for purposes of an upward departure under this policy statement.").

### 3. Sentences of similarly situated defendants

The probation officer recommended a sentence of 240 months. This recommendation is based on probation's guideline calculation that Mr. Morales' offense level is 36 and his criminal history is category V, placing his advisory guideline range at 292—365 months. As discussed in more detail above, the defense calculates Mr. Morales' guidelines as 34/V for 235—293 months.

In order to discuss similarly situated defendants, counsel is relying upon statistics kept by the United States Sentencing Commission.

A sentence of 240 months is 2.5 times the national median sentence of 96 months for the 5,470 offenders in criminal history category V who were sentenced under Guideline §2D1.1 in the last five years (fiscal years 2018 to 2022).

Moreover, only 3.7% of these defendants received a sentence between 20 and 25 years during the same time period. The *vast* majority of similarly situated defendants—85.1%— were sentenced to less than 15 years of imprisonment. The mandatory minimum sentence of 180 months already makes Mr. Morales an outlier from similarly situated defendants, based on these statistics. *See* Figure 2.



*Figure 2*

In the 37 cases from the Northern District of Illinois in the same period, no defendant received a sentence of more than 15 but less than 20 years, while 97.3% of similarly situated defendants received a sentence of less than 15 years (180 months). The median sentence in the Northern District of Illinois was also much lower than the national median sentence at 60 months. The mandatory minimum sentence of 180 months is a consistent sentencing practice with both the median sentence and the largest group of similarly situated defendants in the Northern District of Illinois. *See* Figure 3.



*Figure 3*

Based on this data, a sentence of 240 months as the Probation Office recommends (Sentencing Recommendation, at 1) is out of step with sentences for similarly situated defendants, and greater than necessary. When these statistics are considered in conjunction with the mandatory minimum sentence and the mitigating factors discussed in the history and characteristics section below, it is sufficient, but not greater than necessary, for the court to give Mr. Morales a below-guidelines sentence at the mandatory minimum of 180 months.

**4. History and characteristics of the defendant**

Sheldon is the third of ten children. While his parents were married until he was approximately 15, Sheldon's home was not a happy one. His mom worked as a private care nurse and was the family's sole breadwinner, meaning that she was not home very often. Sheldon recalls her working such long hours that she would come home once a week to cook for the family, and then she was back to work. Sheldon's dad was abusive to both his mom and the kids. Sheldon recalls seeing his dad throw boiling water on his mom on one occasion when he was around five years old, and witnessed too many beatings to count. Despite his mom's long work hours, the family was still desperately poor. Sheldon recalls the water and electricity being

turned off for non-payment frequently. He and his siblings shared clothing and shoes because there were not enough for all of the kids. Even though his mom prepped meals for the family during her precious little time off work, there was never enough food to go around and the kids often resorted to surviving on bread and honey during the week. Sheldon's mom was fortunate to own the house they lived in, however, there were times when the property was so run-down that the city inspectors deemed it uninhabitable, leaving the family homeless for a time.

Sheldon's dad was supposed to be taking care of the kids while his mom was working, however, it appears that his dad largely abdicated this role, making the children responsible for raising themselves. When he decided to attempt to parent, Sheldon's dad used verbal and physical abuse to discipline the kids. Sheldon recalls beatings with an extension cord and being hit in the head with a hammer when his dad thought Sheldon had broken a window. Adding friction to the home, Sheldon's father belongs to the Jehovah's Witness faith, which has very strict rules about contact with those outside the church. Sheldon and his siblings were not allowed to participate in any after school activities that may have kept them from getting involved with life on the streets. His only approved activity was attending church services with his dad—something he did not enjoy, but attended to get his dad to buy him dinner after church.

Sheldon's neighborhood, while in Evanston, was also troubled by drug sales and violence. He remembers older kids paying him $5-10 to hide drugs in the family's yard for them. Drug sales occurred nearly around the clock in the alley behind the family's home, bringing violence associated with drug sales, like shootings, fights and other problems.

Sheldon began running away from home, and finally left when he was 15. He resorted to selling drugs to support himself, and fell further into drug trafficking

when his oldest son was born, when Sheldon was only 18. He loves being a dad, but realizes he made terrible choices trying to support a family with no education and no job skills. He justified his decisions to engage in drug sales as hustling to support his family, but sees now that this wasn't the right path to take.

Unsurprisingly, Sheldon's choices ended with his incarceration. He completed his sentence and was released to New Hampshire, where he intended to build a new life for himself. This changed when his mom was diagnosed with terminal cancer. At first, he continued supporting her and the rest of his family from afar, but eventually, he made the painful decision to move back to Chicago. He knew that coming back to Chicago was a risk, as it put him back in contact with people and situations that led him to prison in 2011, however, he felt that he couldn't continue giving his mom the support she needed from nearly 1,000 miles away. After his return to Chicago, Sheldon again became focused on the wrong things—thinking he needed to support his mom and other family members financially instead of providing emotional support during her final days. He deeply regrets taking the path of least resistance, going back to selling drugs to make fast money.

Empirical research indicates that children who experience adverse childhood experiences (ACEs) are far more likely to have negative outcomes in adulthood, including physical and mental health disorders and aggressive or criminal behaviors. *See* Figure 4.



*Figure 4*

Sheldon scored a 6 out of 10 on the ACE Questionnaire. While his mother fostered positive behavior modeling that provided some protective effect and increased his resiliency, it does not mean that his experiences did not produce lasting effects, and it is unsurprising that he began acting out at an early age.

The British Medical Journal documented the mental and physical health effects that ACEs have on children and adults. Children who experience 4 or more ACEs are 32.6 times more likely to experience learning and/or behavior problems as children and are less likely to complete high school than children with no ACEs. Sheldon recalls that he was always in special education classes as a young child, and he experienced behavioral difficulties throughout his school career. He was either kicked out or dropped out of several schools before eventually completing

his GED while he was incarcerated. Similarly, children with more than four ACEs are 7.2 times more likely to experience high school absenteeism, and 2.8 times more likely to repeat a grade. Sheldon repeated both second and fourth grades. Children with more than three ACEs are 4.5 times more likely to experience behavioral disorders which also affect school attendance and performance, like ADHD, depression, and anxiety than children with no ACEs.

Children who experience 4 or more ACEs are 6.2 times more likely to engage in early alcohol use before the age of 14. Sheldon reports first using alcohol at the age of 12 and drinking "all day, every day" until he was incarcerated in the Illinois Department of Corrections in 2006. Additionally, children are 1.9 times more likely to exhibit aggression or engage in physical fighting *per ACE* than children with no ACEs. Sheldon's score of 6 ACEs means he was 11.4 times more likely to get into fights than children who experienced no ACEs.

The effects of ACEs carry over into adulthood, in both physical health and behavioral impacts. Adults who experience four or more ACEs as a child are 2.1 times more likely to experience cardiovascular disease, and 2.2 times more likely to have asthma, like Sheldon. Similarly, adults who experienced four or more ACEs as a child are 8.1 times more likely to have perpetrated violence, and 7.5 times more likely to have perpetrated intimate partner violence. Sheldon has perpetrated violence against others as a younger man, though he has grown out of much of that behavior in recent years.

Adults who experience four or more ACEs as a child are also 6.8 times more likely to experience anxiety as adults and 4.7 times more likely to experience depression as adults. Sheldon has been diagnosed with moderate anxiety and depression. As Dr. Steven Gaskell detailed in his report, which is filed separately

under seal, Sheldon's moderate depression and anxiety are unsurprising given the nature of his traumatic life experiences detailed above.

It should not be overlooked that Sheldon has made positive strides during his pretrial detention in this case. He has continued pursuing his own growth by participating in any available programming at the MCC. He is currently awaiting enrollment in parenting classes and worked in the kitchen for the past three years, before transferring to working as a unit orderly.

Moving forward, Sheldon plans to pursue a career in construction. After his release from the Bureau of Prisons, he was working construction in New Hampshire until he returned to Chicago to care for his dying mom. He also worked construction in Chicago and was making very good wages as a member of the Local 1 Electricians union. He plans to start his own construction company and wants to move out of Chicago. He wants to pursue mental health treatment during his incarceration and after his release so he can learn how to deal with his emotions. He would also like to volunteer to speak with others facing incarceration because he feels like he has a powerful story to tell and can offer a different perspective on the pitfalls and rewards of reentry. He also wants to give back by helping formerly incarcerated people get back on their feet through employment. He recalls how good it felt for him to get up every day with something productive to do, and how hard it is for someone reentering society to find employment and he'd like to provide that for others.

This court should also consider the effects of a 240 month sentence on Sheldon's children and should reject depriving them of their father for longer than necessary. There is nothing to suggest that Sheldon is not a caring and supportive parent. He wants to raise his children and provide for them. While he was on supervised release, he financially supported his children and Alexis's child from a

DEFENSE SENTENCING MEMORANDUM

prior relationship. He feels like he has let them down and is not the man he wanted to be for them. His family and friends stand ready to support him as well. Both his siblings and his wife, Alexis, say that his whole family supports him and hopes that this Court will give him a second chance.

Most importantly, this conviction and sentence has truly changed Sheldon's life—he is committed to becoming the man he should have been and to making amends to everyone for the harms he's caused. He has seen life on the right path after his release from his prior sentence, and he was, by all accounts, doing well on supervised release until his mom was diagnosed with terminal cancer. He has concrete reentry plans and is committed to engaging in a treatment plan that will enable him to be successful upon release. He is motivated to become a better person, not only for his family, but for himself, and despite his incarceration, he feels hopeful for his future for the first time.

### 5. Deterrence does not require a lengthy sentence

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006).

This conclusion is borne out in the U.S. Sentencing Commission's March 2016 report, *Recidivism Among Federal Offenders: A Comprehensive Overview*. Among the report's key findings is that "with the exception of very short sentences (less than 6 months), the rate of recidivism varies very little by length of prison sentence imposed (fluctuating between 50.8% for sentences between 6 months to 2 years, to a high of 55.5% for sentences between 5 to 9 years)."

More recently, the University of Chicago published a meta-analysis of the deterrent effect of custodial sentences. *See* Petrich, et al., *Custodial Sanctions and*

*Reoffending: A Meta-Analytic Review* (Sep. 22, 2021). In their abstract, the study's authors summarized their findings:

> Previous narrative reviews and meta-analyses concluded that the overall effect of imprisonment is null. Based on a much larger meta-analysis of 116 studies, the current analysis shows that custodial sanctions have no effect on reoffending or slightly increase it when compared with the effects of noncustodial sanctions such as probation. This finding is robust regardless of variations in methodological rigor, types of sanctions examined, and sociodemographic characteristics of samples. All sophisticated assessments of the research have independently reached the same conclusion. The null effect of custodial compared with noncustodial sanctions is considered a "criminological fact." **Incarceration cannot be justified on the grounds it affords public safety by decreasing recidivism**.

Given the empirical evidence regarding the limited deterrent effect of custodial sentences, the mandatory minimum sentence of 180 months is adequate but not greater than necessary to deter Mr. Morales. There is no additional deterrent effect, either general or specific, for a longer sentence.

### 6. Recidivism risk[2]

Mr. Morales is now 42 years old. U.S. Sentencing Commission data shows that recidivism risk decreases with age, dropping sharply after age 25. For defendants between 41 and 50 years old at sentencing, the rearrest rate for defendants in criminal history category V is 35%.7. The reconviction rate for offenders in criminal history category V is a mere 14.5%. Put another way, **85.5%** of offenders in criminal history category V do *not* reoffend. Mr. Morales received ten criminal history points. Similarly, only 13.7% of offenders with ten criminal history points were reconvicted after release.

Based on all the factors present with Mr. Morales, the Court can confidently find that he poses little risk of reoffending after he is released from what will be a

---

[2] All statistics in this section are taken from *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (2004), available at USSC Publications

lengthy period of incarceration. Accordingly, the sentencing concerns of incapacitation and protecting the public from further criminal activities by the defendant beyond the mandatory minimum sentence are slight in this case, which means the need for a lengthy prison sentence beyond what the Court is already required to impose is significantly diminished.

### 7. A fine is not appropriate

The guidelines note that the Court "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." USSG § 5E1.2(a). Probation recommends the Court order Mr. Morales to pay a $10,000 fine, based on speculation that Mr. Morales "likely earned considerable funds from his drug trafficking activities" (Sentencing recommendation at 5). This too, is out of step with similarly situated defendants. Of the 5,470 offenders in criminal history category V who were sentenced under Guideline §2D1.1 in the last five years (fiscal years 2018 to 2022) nationwide, only 350 (6%) were ordered to pay a fine without also being ordered to pay restitution. *See* Figure 5.



*Figure 5*

Likewise, in the Northern District of Illinois during the same period, of the 37 offenders in criminal history category V who were sentenced under Guideline §2D1.1, none were ordered to pay a fine and only one was ordered to pay restitution. The remaining 36 similarly situated defendants were not ordered to pay any financial penalty.

Mr. Morales has no present income and thus has no ability to pay a fine. The Court appointed counsel to represent Mr. Morales under the CJA due to his lack of financial resources. Moreover, Mr. Morales' income once released is uncertain, and it is unlikely that he will be able to pay a fine in the future. Consequently, the defense requests that the Court decline to impose a fine.

**8. Objections to discretionary conditions of supervised release**

*Partial objection to Discretionary Condition 16*: Mr. Morales objects to the requirement that Probation be allowed to visit him at work. Employers often view

workplace visits as intrusive or disruptive to the workplace, even when they are aware that employees are under supervision, and often terminate employment after such a visit. This creates tension with the goals of rehabilitation and Discretionary Condition 4, that Mr. Morales seek and maintain employment. Probation can adequately supervise Mr. Morales with home visits, visits to community service locations, or visits at other reasonable locations specified by the supervising officer, including meeting with Mr. Morales near his workplace during his breaks, such as a nearby coffee shop or restaurant, or in the parking lot of his workplace.

*Objection to Discretionary Condition 23*: Mr. Morales plans to live with his wife and minor children upon his release. This condition fails to adequately protect the privacy rights of his wife and children who will live with Mr. Morales by allowing his probation officer to search the entire home on mere "reasonable suspicion" and requires nothing more than a warning from Mr. Morales that this condition allows the probation officer to search the entirety of the home.

Imposition of this condition may result in an unstable housing situation for Mr. Morales, as other cohabitants may be reluctant to let him live with them if their belongings are subject to searches. Moreover, it is relatively easy for the probation officer to get a warrant from the court if they believe that Mr. Morales is violating the terms of his supervised release. This judicial oversight would protect the privacy rights of cohabitants while allowing probation to investigate alleged violations of supervised release.

*Objection to Special Conditions 5, 6, 7, and 8*: Mr. Morales objects to this group of conditions collectively, as unnecessary should the court decline to order Mr. Morales to pay a fine in this case. All four of these conditions are designed to ensure that defendants meet their financial obligations while on supervised release, most commonly in the form of restitution payments. Probation has proposed these

conditions in order to ensure Mr. Morales' compliance with his financial obligation if the court imposes a fine (Sentencing recommendation at 1). As discussed in more detail above, the defense believes that a fine is not appropriate, and these conditions are not necessary.

*Objection to Special Condition 13*: This condition is unconstitutionally vague and an impermissible delegation of judicial authority. The condition reads:

> if the probation officer determines that you pose a risk to another person (including an organization or members of the community), the probation officer may require you to tell the person about the risk, and you must comply with that instruction. Such notification could include advising the person about your record of arrests and convictions and substance use. The probation officer may contact the person and confirm that you have told the person about the risk.

PSR at 60.

There is no factual basis in this case to support this condition. The instant offense is not a crime of violence and Mr. Morales does not have any prior convictions for offenses against children or other vulnerable individuals who may need additional protection from his probation officer. His family and wife are aware of his prior convictions and do not require notification. His prior employers are likewise aware of his prior convictions and do not require notification, should he resume working for them after his release. If Mr. Morales finds new employment after his release, notification may jeopardize his continued employment, and much like the condition allowing his probation officer to visit him at work, it creates tension with the goals of rehabilitation and Discretionary Condition 4, that Mr. Morales seek and maintain employment. In fact, that sort of compelled employer notification has been specifically rejected by the Second Circuit. *See United States v. Peterson*, 248 F.3d 79, 86 (2d Cir. 2001).

If the Court imposes this condition over the defense's objection, it should be modified. The Seventh Circuit has not yet addressed this condition in any

DEFENSE SENTENCING MEMORANDUM

published case, but the Second and Tenth Circuits have. In *United States v. Boles*, 914 F.3d 95, 111-12 (2d Cir. 2019), the Second Circuit held that a functionally identical condition was unconstitutionally vague and granted the probation officer too much discretion. Similarly, in *United States v. Cabral*, 926 F.3d 687, 697-99 (10th Cir. 2019), the Tenth Circuit held that a similar condition was an unconstitutional delegation of judicial power to the probation officer.

After these cases were decided, the respective district courts responded by issuing standing orders that revised the language of the condition to include a requirement that the probation officer must obtain court approval before requiring a risk notification. The District of Colorado's revision reads:

> If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may, after obtaining Court approval, notify the person about the risk or require you to notify that the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.

*United States v. Martinez*, 2021 U.S. App. LEXIS 18681, at *10 n.4 (10th Cir. June 23, 2021). The Western District of New York similarly issued a standing order with a revised condition, which reads:

> If the court determines in consultation with your probation officer that, based on your criminal record, personal history and characteristics, and the nature and circumstances of your offense, you pose a risk of committing further crimes against another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.

*United States v. Traficante*, 966 F.3d 99, 104 (2d Cir. 2020). While both new versions of the condition have since also been challenged, the Second and Tenth Circuits have both turned the challenges away on ripeness grounds. *See Martinez*, 2021 U.S. App. LEXIS 18681, at *4-11; *Traficante*, 966 F.3d at 105-07.

Based on the reasoning of *Martinez* and *Traficante*, any risk-notification condition should require judicial preclearance before compelled notification. Of the

two example revised conditions, the defense suggests the condition used by the Western District of New York. That condition provides more guidance on the factors to be considered by the probation officer and the Court before requiring a risk notification.

Respectfully Submitted,

/s/ Holly N. Blaine
Attorney for Sheldon Morales

Holly N. Blaine
Blaine & Vanzant, LLP
922 Davis Street
Evanston, Illinois 60201
(312) 788-7584
hnb@blainevanzant.com