UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SHELDON MORALES and<br>EDUARDO SANTANA | No. 19 CR 850<br><br>Judge Mary M. Rowland |

**GOVERNMENT'S POSITION PAPER ON SENTENCING FACTORS**

Defendants Sheldon Morales and Eduardo Santana have been engaged in criminal activity since the mid-1990s. Both have served substantial time in prison and both have faced federal charges. Both were lucky to be out of prison in 2019 when they teamed up to distribute cartel quantities of fentanyl, cocaine, and methamphetamine in the Chicago area.

As a result of the large quantity of drugs and their lengthy criminal histories, Morales has a guidelines range 292 to 365 months, and Santana has a guidelines range of 235 to 293 months. The 18 U.S.C. § 3553(a) factors support a guidelines sentence for both defendants.

**I.  BACKGROUND AND OFFENSE CONDUCT**

The facts in this sentencing memo are taken from the presentence investigation reports (designated MPSR or Morales and SPSR for Santana), the government's version of the offense (GVO) and its exhibits, the trial transcript (Tr.), and the additional wire calls which will be filed separately under seal as Sealed Exhibits 1-7.

1

### A.     Sheldon Morales Personal and Criminal History

Sheldon Morales was born in Evanston as one of ten children. MPSR ¶¶ 173-74. His parents immigrated from Belize. MPSR ¶ 173. Morales was primarily raised by his mother, with whom Morales had a close relationship until she died in 2020. MPSR ¶¶ 175-77. Morales had learning difficulties and was placed in special education starting in third grade. MPSR ¶¶ 211.

By the age of 13, Morales had approximately sixteen juvenile arrests for arson, battery, criminal damage to property, criminal trespass to vehicles, possession of a stolen vehicle, robbery, aggravated assault, and possession of a controlled substance. MPSR ¶¶ 43-44, 110-124. For his criminal trespass and arson offense, Morales received time in the Illinois Department of Juvenile Justice, and was returned multiple times for re-offending. *Id.* ¶ 45. Between ages 16 and 20, Morales was convicted over thirty times of offenses that include battery, reckless conduct, aggravated assault, unlawful use of a weapon, aggravated assault, resisting a peace officer, and criminal damage to property. *Id.* ¶¶ 45-78.

At age 20, Morales received an eight-year sentence for residential burglary. MPSR ¶¶ 79-80. Morales was released by age 24, at which point he was arrested and convicted of possession of a controlled substance. *Id.* ¶ 81. At age 26, Morales was convicted of possession of a controlled substance again, and sentenced to two years' imprisonment. *Id.* ¶ 88. At age 29, Morales was convicted in this federal courthouse of possession with intent distribute cocaine. PSR ¶ 97. Judge St. Eve sentenced Morales to 108 months imprisonment in 2013. In 2015, Judge St. Eve re-sentenced to

2

84 months imprisonment based on an amendment to the Sentencing Guidelines which lowered the base level for narcotics offenses. *Id.* Morales was released on supervised release in January 2018. *Id.*

Morales is currently married and has a three-year old son with his wife. MPSR. ¶¶ 179, 180. Morales also has seven other children from seven previous relationships. MPSR ¶¶ 180-186. One of those mothers has the same name as the woman who lived at the Davis Street address, discussed below, where defendant received narcotics. *Id.* ¶ 184; Trial Stipulation 5. Morales reported that he "supported them all financially prior to his detainment." *Id.* ¶ 187. Morales's employment record is limited to a few years of construction work. *Id.* ¶¶ 215-218.

**B.     Eduardo Santana Personal and Criminal History**

Santana was born in St. Croix in the Virgin Islands as the eldest of three children. SPSR ¶¶ 92-93. Santana attended school through the Seventh Grade in the Virgin Islands, and moved to the United States when he was seventeen years old. *Id.* ¶¶ 97, 123. Santana lived with his father briefly before he and his sister were kicked out by their father. *Id.* ¶ 97. Santana reports that he joined the Gangster Disciples street gang around this time. *Id.* ¶ 107.

Santana's criminal history begins at age 19. After receiving court supervision for a cannabis conviction, Santana was sentenced to a total of 330 days' custody for burglarizing a vehicle by smashing the window with a group of three subjects, and then engaging in reckless conduct while on bond for that burglary charge. SPSR ¶¶ 40, 42. At ages 20 and 21, Santana was arrested and convicted of burglary and

3

possession of a controlled substance, including cocaine. SPSR ¶¶ 44, 46, 48. He was given an additional two years for possession of cannabis in a penal institution. *Id.* ¶ 49. Six months after being released, he was convicted of manufacture/delivery of 15-100 grams of cocaine, and then perjury in connection with the court proceeding, and was sentenced to a total of six years' imprisonment. *Id.* ¶¶ 50, 53. In his early 30s, Santana was convicted of possession of ammunition and possession of counterfeit credit cards. SPSR ¶¶ 56-57.

In 2017, defendant was charged in this courthouse with possession with intent to distribute cocaine, possession of a firearm in connection with a drug trafficking offense, and felon in possession of a firearm. SPSR ¶ 90; GVO at 2-6. As explained in the government's version of the offense, the case was voluntarily dismissed by the government after it learned that the case agent, Fernando Gomez, was under a covert investigation run by the United States Attorney's Office for the Southern District of New York. *Id.* The dismissal was necessary given the government's disclosure obligations in advance of trial that would have compromised the Gomez investigation. *Id.*

Santana is the father of eight children. SPSR ¶¶ 99-100. The children have five different mothers, one of whom is deceased, and defendant reported that "he has been involved in the lives of each of his children and was financially responsible for them." *Id.* ¶ 100. Santana reported that he was self-employed as an auto mechanic, in which he purchased used vehicles, repaired them, and resold them for profit. *Id.* ¶ 129. Santana also worked as a landscaping laborer in 2019, before his arrest in this case.

*Id.* ¶ 128.

### C. Instant Offense

#### 1. Santana's Earlier Participation in Conspiracy

On February 15, 2019, three days after the wire went up, Morales was intercepted talking to an unidentified male with a Belizian phone number, in which they discussed an earlier transaction in which profits were split with Santana. MPSR ¶ 10; MPSR ¶ 9. During the call, Morales said who asked "how you gonna split it up for you and Guajo," meaning Santana. Ex. 301:44-45; Tr. 186-91. Morales responded that "Guajo" was "getting his chop for what he did and that's it." Ex. 301:52-53. When the Belizean caller asked "you ain't gonna split nothing with him like that," Morales explained, "[n]o, I'm giving him a whole one from first thing that we did. You feel what I'm saying." Ex. 301:62-63.

#### 2. February 19, 2019 Samples Package

In a series of phone calls between February 15 and 19, 2019, Morales spoke with two co-conspirators who were incarcerated at a Texas prison.[1] MPSR ¶ 10; SPSR ¶ 9. They discussed a package of samples that would be sent to a residence on Davis Street where one of the mothers of Morales's children lived. *Id.*

On February 19, 2019, Morales asked Individual C, a family member, to pick up a package at the Davis Street residence and place it in a trunk of a vehicle at an

---

[1] The two co-conspirators are referred to in the government's version as UM-1 and UM-2, which is their designation in the trial transcripts. In the PSR, they are referred to as Co-Conspirators A and B, which was their designations in the criminal complaint against Morales. R. 1.

5

auto repair business in Evanston. MPSR ¶ 11; SPSR ¶ 10. Surveillance officers later took video of defendant meeting Individual C at a nursing home parking lot, where Morales received the narcotics samples. *Id.* The following day, defendant told Co-Conspirators A and B that his "homeboy" had "taste[d] it," meaning sampled the heroin. Ex. 309T:86; Ex. 310T:24-25.

### 3. Threat Incident

On Saturday night, February 23, 2019, Bartlett Police were called out to investigate a home invasion and robbery of Sheldon Morales' rental home in Bartlett, Illinois. Individual N, who was doing work on the house, was present and suffered a bullet graze wound to the head. Supp. GVO Ex. 8. After that incident, Morales was intercepted in a series of phone calls talking about who he suspected committed the robbery, including Individual N. *See* Sealed Exhibits 1-7 (transcripts).

### 4. March 1, 2019 Package

On February 28, 2019, defendant asked Co-Conspirators A and B to send him heroin, requesting "please make sure that is real good," and methamphetamine, which defendant referred to as "ice." MPSR ¶ 12; SPSR ¶ 11; GVO at 11. On March 1, 2019, DEA intercepted a package destined for the Davis Street address which had 5.43 kilograms of methamphetamine and 827 grams of fentanyl. MPSR ¶ 13; SPSR ¶ 12. Afterwards, DEA intercepted phone calls between defendant and Individual C, who he asked to go check on the package at the Davis Street address. *Id.*

Eight days later, on March 9, 2019, Santana translated a call between Morales and another supplier, in which Morales referred to the "ice" that he "got today." GVO

6

at 13; MPSR ¶ 14; SPSR ¶ 13. Between March 14, 2019 and March 29, 2019, the wire was down.

### 5. Morales and Santana Calls Late March and Early April

The second wire period began on March 29, 2019. On March 30, 2019, Morales had a three-way call with Santana and his supplier, Omar, who was using a second phone. MPSR ¶ 14; SPSR ¶ 13; Ex. 319T; Tr. 235:7-16. Morales asked for assurance that the package would arrive Tuesday because he had "a lot of people lined up" and could "do twenty of 'em, easy." *Id.*:121-23.

After Omar dropped off the three-way call, Morales told Santana "I just bought a brick compressor for fifteen hundred" and "you gotta see this shit, bro'. The shit look just like coke." Ex. 319T:205-07. Morales explained that a friend "showed me the shit that, that you can put on the coke and, and make the coke come back and it got fish scales and everything," adding "you remember that shit I was telling you about?" *Id.*:259-62. Santana stated that "Man, I hope eventually you get that shit cause, man, I got, you know... I'mma try to push my little pow-wee [PH] out. That mofo be sweating me for it. I just be like, 'Man I'm popped.'" *Id.*:274-77. Morales responded "for what?" Santana clarified "for the powder … you know that small shit." *Id.*:279-85. Morales told Santana "Oh, man, man, we [U/I] straight, though. I'm telling you. Especially with this shit that Nate just showed me." *Id.*:287-89. Morales added "we finna go to the moon, bro." *Id.*:194.

On April 2, 2019, Morales had a three-way call with Omar and Santana, in which Santana again translated for both sides. Ex. 320T. In the call, Omar advised

7

that a package would be shipped shortly. Tr. 246:4-11. Morales told Santana to "tell him … I've waiting all day for the ice … it ain't made it yet." Ex. 320T:77-78. After Omar got off the three-way call, Morales told Santana to be "respectful" to Omar because "this shit gonna be beneficial to all of us" and "all that shit gonna take us a long way bro." Ex. 320T:293-94, 367. Morales explained that "he on his way back to Mexico, and he... They gonna have a meeting with all the other head dudes; and he said that they gonna make us the office of Chicago." *Id.*:425-28. Morales explained, "He's saying that we running Chicago, bro'! That whatever the fuck we want, bro'... That from their cartel bro', that we're the head, we're the head of Chicago, bro', from their cartel." *Id.*:438-41.

### 6. Santana Checks on Empty Package

On April 10, 2019, Morales, Santana, and Omar had another three-way call in which Morales explained that he was waiting for a package to arrive and believed that he saw covert law enforcement vehicles waiting. MPSR ¶ 14; SPSR ¶ 13; Tr. 249:16-17. After translating for Morales, Santana asked "you want me to pass through?" Ex. 321T:168. When Morales began to give him directions to "come down Kimball," Santana asked "[i]t's not over by [the woman at the Davis Street address]?" Tr. 250:20-21. Officer Geyer testified that this was a reference to the residence on Davis Street, where the February 19 and March 1, 2019 packages were sent. Tr. 250:20-251:1. During the call, Santana explained that he was "riding down Maine Street now" and "Kimball will be popping up soon." Ex. 321T:341-47. Morales gave

8

Santana the address on Kimball. *Id.*:382-33.

Based on that interception, Officer Geyer traveled the Kimball address and recognized Santana driving southbound on Kimball. Tr. 251:18-21. Shortly afterwards, Santana had a phone call with Morales and Omar in which Santana assured Omar "[l]ook, that box is empty, man. On my kids, on his kids and all of them together… I went there… Because I took the risk since you're saying he's scared or something. I went, took the risk and stood in front of the door pretending that I was ringing the doorbell. And I'm kicking the box with my feet. I recorded a video so you can see, so you can see that I'm not lying…." Ex. 321T:28-34. Santana went on, speaking directly to Omar in Spanish:

> In God's name and in the name of my kids I went there right now. I recorded a video. It's here on my phone and the box is empty. There's nothing in there at all. There's no weight in the box whatsoever. I gave it a slight kick and the box flies since it's empty.
> ….
> I don't know what's going on dude. I'm telling you from my heart. I'm telling you in God's name, there's nothing in that box. I didn't see anyone because he, he says he saw some people when [U/I]. But I went there and I didn't see anyone, but the box is empty. I have a video and I can send it to you so you can see [U/I] and everything.

Ex. 321T:43-56. Omar then asked Santana to write down his cell phone number so that Santana could send him the video. *Id*:58-59. Omar gave Santana his other phone number, which Santana put in his other phone in order to send Omar a video of the box. *Id.*:152-58.

The DEA recovered the box from the porch of the Kimball address, obtained a search warrant to open it, and found out that it only contained packing peanuts and

9

a postal inspector's business card. Tr. 256:25.

### 7. Additional Conspiring by Morales and Santana

On the day after the empty package was seized, Morales had another call with Santana and Omar. MPSR ¶ 15; SPSR ¶ 14; Tr. 273. Santana translated for Morales that Omar was going to "send you … some shit tomorrow" and "Pedro went to Los Angeles to do that." Ex. 323T:59-73. After Omar dropped from the call, Santana asked Morales to confirm, "[h]e not on the phone, right?" Tr. 323T:136. Santana then proposed how Morales could trick Omar by creating a video making it look like the narcotics were seized by police, but keep the narcotics and rip Omar off. Tr. 274:8-20. Santana explained "Bro, you can't [U/I] better than that. Play your role and we do what we do our best, and boom they take the fall. They on it." Tr. 232T:168-70. The two then discussed a mutual acquaintance, a "crack head," who could participate in the scheme. Ex. 323T:270-75. This individual, Morales proposed, could retrieve an empty box after they reported a suspected narcotics package to the police, and they could make a video of the arrest to fool Omar. Tr. 274-75; Ex. 323T:185-95.

Later that day, Santana and Morales had another call in which Santana said "ol' boy keep harassing me," referring to Omar, and "I tell him 'man look, you ain't hollering right now." Ex. 324T:55-56. Morales said "I sent dude some of them empty boxes," referring to Omar's request for payment back by mail. Tr. 8-16. Santana asked "but did you slice it on the side?" so that it would look like somebody tampered with the box and removed the money. Ex. 324T:77; Tr. 277:3-9. Santana explained "[i]f you slice it, he know, he gonna look like man these people out here, the place doing that

10

shit … [t]hat's why I told you, you gotta throw something in there, some Mexican shit in there." Ex. 324T:86-92.

About 24 minutes later, Morales and Santana had another phone call with Omar in which Omar asked about boxes he was expecting, and Morales said that he would send him the tracking number. Tr. 277:19-20. After Omar dropped from the call, Santana told Morales "just send it to him," and "if anything hit me back." Ex. 325T:75-79. A few minutes later, they had another three-way call with Omar in which Morales explained that he used the same tracking number for both boxes. Tr. 279:1-3; Ex. 326T:1-85.

On April 14, 2019, Morales and Santana had a call with Omar in which Santana translated that Morales "wants to know if he's going to be getting that tomorrow for sure because if now, I mean, he has a lot of people waiting in line." Ex. 327T:62-65. Omar responded that it would arrive by tomorrow and that he was sending "five at a time until I complete twenty." *Id.*:75-76. Morales asked Santana to "tell him if the quality is better, tell him then I can cut it and tell him I can make more money and I'll be able to make that money faster, what we just lost out on." *Id.*:97-99. Omar responded in Spanish "tomorrow he will get pure." *Id.*:125. Santana then translated back that Omar "want[ed] to know if you got he bread for the … ice," meaning money for meth that had already been sent. *Id.*:133-34, 68. On that topic, Morales told Santana "he sent me 6.6 keys" which meant 6.6 kilograms or 15 pounds. Tr. 282:21-25. Santana translated to Omar in Spanish that Morales "says you sent him … 6.6 kilos." Ex. 327T:171-72. Morales noted that Omar told him it would be

11

$5,000 for a kilogram, and Santana corrected calculated that 6.6 kilograms x $5,000 would be $33,000, stating in Spanish, "[t]hen it's thirty three, right?" Ex. 327T:192.

Omar had to drop off the call because he was driving, and Morales and Santana continued the discussion. Morales told Santana that he thought the woman who lived at the Davis address "called the feds on me." Tr. 283:6-15. Morales explained that he woke up thinking "I can see this bitch calling the feds" and then right afterwards, Morales' mom told him that "I'm feeling a bad vibe with [her] and the feds and something … just be careful." Ex. 327T:345-57. Morales told Santana that right afterwards, "the dude from Spex called me" and told him that some guys who "were police," maybe "with the Federal people," were asking him if they can search a black truck at Spex. *Id.*:386-99. Morales explained that the guy from Spex "asked me do I mind if they searched it … if they come back, do I mind?" *Id.*:403-08.

In response, Santana remarked that "she could get touched. There is a lot of fucking bitches out here that need to get touched so, [U/I] that's what we need a goon, goon bitch in the squad that she gonna do whatever the fuck is necessary." *Id.*:495-98. Officer Geyer testified that he interpreted Santana's use of "squad" to refer to "their narcotics trafficking organization." Tr. 284:9-10.

### 8. Post-Wire Seizures of Cocaine and Fentanyl

After the second period, law enforcement intercepted two more packages that were tied to the charged conspiracy. On May 10, 2019, a package destined for Evanston was intercepted which had nearly two kilograms of cocaine. MPSR ¶ 16; SPSR ¶ 15. The return address had the same Johnny's Commercial Kitchen address

in Las Vegas from the March 1, 2019 package. Tr. 288-89.

On September 16, 2019, a package addressed to "LaToya Jackson" at Morales's home address in Morton Grove was intercepted and found to contain quantities of 30.48 grams and 844.1 grams of fentanyl. On September 19, 2019, agents conducted a controlled delivery of the package and then executed a search warrant on the Mango Avenue Residence. Morales's girlfriend (now wife), mother, and sister were at the residence and the package had been moved to the garage. GVO Ex. 7 ¶ 5. Morales's sister advised that the property in the garage was Morales's. *Id.* ¶ 3.

## II. A Guidelines Sentence is Appropriate for Both Defendants

Both defendants were given a second chance after being charged with federal drug offenses. Rather than appreciate their good fortune of being out of custody, they conspired to distribute extremely deadly and addictive drugs. A guidelines sentence is necessary for specific and general deterrence. Defendants have each flouted the law their entire adult lives and continued to do so into middle age. A guidelines sentence for each is necessary to ensure that this is their last offense.

### A. Sheldon Morales

Morales has been in and out of prison since he was a young teen. While serving his last federal sentence in the Bureau of Prisons, Morales had two years shaved off thanks to timing of a Guidelines amendment. Morales took advantage of that early freedom by committing this offense. While the wire was up in February 2019, defendant told a friend on the phone,

> When I was in jail, bro', I really realized who the fuck I was…. Who the fuck

13

> you know in three or four months make three, four mil. Who you know that do that?! …. I did that before I got locked up, so when I realized who I was when I was locked up, I'm like "Damn! Bro', I'm a cold motherfucker."

Sealed Ex. 7 at 4:22-5:3.

Defendant has made these enormous drug profits by exploiting the suffering of others. Morales explicitly ordered fentanyl from his suppliers, got a user to test it out for him, and ordered a wholesale quantity to distribute. Fentanyl is up to 50 times stronger than heroin and 100 times stronger than morphine. According to the Centers for Disease control, over 150 people die every day from overdoses related to synthetic opioids like fentanyl.[2] Fentanyl is more cost effective and more addictive than heroin, which explains why Morales ordered it, even though its dangers were well-known in 2019.

If there is anyone who should have known the consequences of his actions, it is Morales. He led this brazen conspiracy while on supervised release for a federal drug offense. Morales's criminal history category V does not overstate his criminal track record. Notably, defendant has two unlawful use of a weapon convictions that receive no criminal history points because the Illinois statute was later invalidated, multiple convictions that are too old to receive criminal history points, and dozens of arrests that resulted in no convictions.

A guidelines range of 292 to 365 months is a lot of time, but it is a natural and predictable consequences of Morales's actions after multiple warnings. A guidelines

---

[2] https://www.cdc.gov/stopoverdose/fentanyl/index.html (last visited March 5, 2024)

sentence is necessary to keep Morales from re-offending, and to deter other narcotics traffickers, who need a message that they will be out of second chances and sentencing breaks when they find themselves in federal court for the second time.

### B. Eduardo Santana

After spending time in and out of jail his adult life, Santana found himself, at the age of 41, facing federal charges for the first time in 2017. His drug and gun charges included a 924(c) charge that carried a five-year mandatory consecutive sentence. While detained on that case and getting ready for trial, defendant was given an extremely rare lucky break. The government voluntarily dismissed defendant's case and he walked out of prison. As detailed in the government's version of the offense, the evidence in support of these charges was strong, and Agent Gomez was not a necessary witness, but the government believed it had a disclosure obligation that it could not fulfill. As a result, Santana received an enormous windfall that other defendants could only dream of.

Less than a year later, Santana made the decision to continue his career in the drug trafficking business. He knew Morales all his adult life and was well-aware of the scope of Morales's drug trafficking organization. In his intercepted calls, the two discussed it in explicit detail—a brick compressor of cocaine, a fifteen-pound shipment of methamphetamine, and working with a Mexican cartel. The fifteen pound, or 6.6 kilograms of methamphetamine, that Santana is being held accountable had the potential to cause severe addiction, serious health problems, and even

overdose deaths.[3]

Santana did not get suckered into being part of something he did not bargain for, as he argued at trial. After being given a "get out of jail free" card, he stepped right back into drug trafficking and schemed with Morales about how to maximize their profits. A sentence in the resulting guidelines range of 235 to 293 months is warranted.

**III.    Conclusion**

For these reasons, the government recommends a sentence within the guidelines of 292 to 365 months for Morales, and within the guideline range of 235 to 293 months for Santana.

                                                  Respectfully submitted,

                                                  MORRIS PASQUAL
                                                  Acting United States Attorney

By:    /s/ *Charles W. Mulaney*
           CHARLES W. MULANEY
           Assistant United States Attorneys
           219 South Dearborn Street, 5th Floor
           Chicago, Illinois 60604

---

[3] https://www.samhsa.gov/meth (last visited March 5, 2024)